**JOHNSON FISTEL, LLP**
Frank J. Johnson (SBN 174882)
FrankJ@johnsonfistel.com
Brett M. Middleton (SBN 199427)
BrettM@johnsonfistel.com
Kristen O'Connor (SBN 305113)
KristenO@johnsonfistel.com
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Counsel for Plaintiff Timothy Compernolle*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY COMPERNOLLE, derivatively on behalf of ZUORA INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>TIEN TZUO, TYLER SLOAT, MARC DIOUANE, PETER FENTON, KENNETH A. GOLDMAN, TIMOTHY HALEY, JASON PRESSMAN, MICHAELANGELO VOLPI, MAGDELENA YESIL, OMAR ABBOSH, AND SARAH BOND,<br><br>Defendants,<br><br>-and-<br><br>ZUORA INC., a Delaware corporation,<br><br>Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Timothy Compernolle ("Plaintiff"), by his undersigned counsel, brings this shareholder derivative action on behalf of Nominal Defendant Zuora, Inc. ("Zuora" or the "Company") against certain current and/or former officers and directors of the Company for violations of law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and for contribution for violations of the federal securities laws.

Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (i) review and analysis of public filings made by Zuora and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (iii) review of news articles, shareholder communications, and postings on Zuora's website concerning the Company's public statements; (iv) publicly available pleadings, papers, and court documents, including any documents filed with and publicly available from the related pending securities fraud class action, *Roberts v. Zuora, Inc.*, Case 3:19-cv-03422-SI (N.D. Cal.) (the "Securities Class Action"); and (v) review of other publicly available information concerning Zuora, the Individual Defendants (defined below), and the Wrongful Refusal Defendants (defined below).

## I.      NATURE AND SUMMARY OF THE ACTION

1.      Zuora is a self-lauded "evangelist" of the "subscription economy," which refers to its role in the shift—over the course of the past decade—in both consumption and selling behavior from a product- or service-centric approach to a subscription model centered around ongoing customer relationships.

2.      Specifically, through Zuora's subscription order-to-cash platform, dubbed the Zuora Central Platform, the Company offered its "flagship" software application products, Zuora Billing ("Billing") and Zuora RevPro ("RevPro").

These two applications helped customers with accounting metrics whose business models were based on revenues derived from sales of subscription services. For example, customers used Billing for accounting related to subscription billing, while customers used RevPro as a revenue recognition solution. Significantly, Zuora's directors and officers led the Company's clients *to believe the two applications could be used collectively*.

3.     In late 2018, achieving integration became a particularly salient objective among Zuora's clients due to a change in accountancy law for public companies. Beginning from at least April 12, 2018 and continuing through the present (the "Relevant Period"), Zuora's directors and officers caused the Company to misrepresent and conceal significant integration issues between Billing and RevPro. Despite assembling two project teams to resolve ongoing integration issues, after 1.5 years, Zuora failed to integrate Billing and RevPro.

4.     Zuora's directors and officers were well-apprised of the Billing and RevPro integration failure. They also knew the problem severely impacted sales and demand for the Company's products. In fact, the Company's most important Billing customer, Zoom Video Communications ("Zoom"), initially elected to purchase RevPro but ultimately ceased implementation due to the integration failure and then stopped making payments.

5.     Yet, notwithstanding their knowledge of the Company's crippling technology failures and customer losses, Zuora's directors and officers stoked investor excitement by causing the Company to falsely and misleadingly represent that Billing and RevPro could function as a combined solution and that the Company would experience strong growth as a result. Unbeknownst to the investing public, these statements omitted, altogether, the following material facts:

> (i)     Billing and RevPro customers could not successfully merge the data from both systems;

(ii)    Zuora could not offer a robust, single system for subscription businesses to manage their monetization strategies, billing terms, customer payment and collection, and revenue recognition; and

(iii)    Zuora experienced sales execution problems (including difficulties cross-selling Billing and RevPro), reduced demand, and customers refused to pay for these services.

6.    As a result of these improper statements and omissions, Zuora suffered significant damages, including, without limitation, the costs and expenses of a securities fraud class action (and any potential settlement or judgment therefrom), the cost and expenses of compensation to derelict directors and officers in breach of their fiduciary duties, and a loss of credibility and market capitalization.

7.    On June 10, 2020, Plaintiff issued a written demand (the "Demand") on Zuora's board of directors (the "Board") to investigate and take the necessary legal action against those responsible for the damages the Company has sustained as a result of the wrongdoing detailed herein. Notwithstanding that more than eight months have passed since Plaintiff issued the Demand—and in total and patent contravention of Delaware law and the directors' fiduciary duties—the Board unreasonably and wrongfully ignored the Demand.

8.    The Board has failed to act independently, in good faith, and within the realm of sound business judgment in so doing.

9.    In response to the Board's unreasonable and wrongful failure to respond to Plaintiff's Demand and disinterestedly and independently investigate and remediate harms caused to the Company, Plaintiff has filed this action alleging breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and for contribution for violations of the federal securities law. Because the Board's

3

1  failure to respond to the Demand was improper and directly at odds with the
2  Board's fiduciary duties, as detailed further herein, this derivative action should
3  be permitted to proceed for the benefit of the Company and its shareholders.

4  **II.  <u>JURISDICTION AND VENUE</u>**

5  10.  This Court has jurisdiction over the claims asserted herein under
6  28 U.S.C. § 1332 because there is complete diversity among the parties and the
7  amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

8  11.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that this
9  action states a federal question.  Plaintiff has asserted a federal claim for
10  contribution derivatively on behalf of the Company, arising under Sections 10(b)
11  and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.
12  § 78u-4.  Pursuant to federal statutory law, this Court has original federal question
13  jurisdiction over the federal contribution claim.

14  12.  This Court has supplemental jurisdiction over the remaining claims
15  under 28 U.S.C. § 1367.

16  13.  This action is not a collusive action designed to confer jurisdiction on
17  a court of the United States that it would not otherwise have.

18  14.  This Court has personal jurisdiction over each defendant because
19  each defendant is either a corporation conducting business and maintaining
20  operations in this District or is an individual who is either present in this District
21  for jurisdictional purposes or has, directly and indirectly, used the means and
22  instrumentalities of interstate commerce, including, but not limited to, the
23  United States mails, interstate telephone communications, and the facilities of the
24  national securities exchanges and markets, such that each defendant has sufficient
25  minimum contacts with this District so as to render the exercise of jurisdiction by
26  this Court permissible under traditional notions of fair play and substantial justice.

27  15.  Venue is proper in this District pursuant to Section 27 of the
28  Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b), (c), and (d).  Zuora

maintains its headquarters in San Mateo, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

16.     Pursuant to Local Rule 3-5(b), Plaintiff requests the clerk assign this action to the San Francisco Division of this district as, under Local Rule 3-2(c), a substantial part of the events or conduct giving rise to the claims herein occurred in the San Mateo County, California.

III.     **THE PARTIES**

A.     **Plaintiff**

17.     Plaintiff Timothy Compernolle is a current shareholder of Zuora and has continuously held Zuora common stock at all relevant times.  Plaintiff is a citizen of Illinois.

B.     **Nominal Defendant Zuora**

18.     Nominal Defendant Zuora is incorporated under the laws of Delaware with its principal executive offices located in San Mateo, California.

19.     Zuora is an issuer of the common stock.  Zuora's common stock trades on the New York Stock Exchange under the symbol "ZUO."  As of December 31, 2020, Zuora had 108.9 million shares of Class A common stock outstanding.

C.     **Individual Defendants**

20.     Defendant Tien Tzuo ("Tzuo") has served as the chief executive officer ("CEO") and a member of the Board since Zuora's inception in 2007 and

chairman of the Board since 2017.  Tzuo is a defendant in the Securities Class Action.  Tzuo received $402,120.00 in total compensation from the Company in 2018, $2,996,581.00 in total compensation from the Company in 2019, and $3,435,030.00 in total compensation from the Company in 2020.  Tzuo is a citizen of California.

21.    Defendant Tyler Sloat ("Sloat") served as the chief financial officer ("CFO") of Zuora from 2010 to April 2020.  Sloat received $2,176,863.00 in total compensation from the Company in 2020.  Sloat is a defendant in the Securities Class Action.  Sloat is a citizen of California.

22.    Defendant Marc Diouane ("Diouane") served as the president of Zuora from 2014 to December 2019.  Diouane received $2,155,072.00 in total compensation from the Company in 2018, $1,457,142.00 in total compensation from the Company in 2019, and $1,607,610.00 in total compensation from the Company in 2020.  Diouane is a citizen of California.

23.    Defendant Peter Fenton ("Fenton") has served as a Zuora director since 2007.  During the Relevant Period, Defendant Fenton served on the Board's Audit Committee.  Fenton is a citizen of California.

24.    Defendant Kenneth A. Goldman ("Goldman") has served as a Zuora director since 2016.  Goldman received $187,483.00 in total compensation from the Company in 2019 and $199,991.00 in total compensation from the Company in 2020.  During the Relevant Period, Defendant Goldman served on and was chair of the Board's Audit Committee.  Goldman is a citizen of California.

25.    Defendant Timothy Haley ("Haley") has served as a Zuora director since 2010.  During the Relevant Period, Defendant Haley served on and was chair of the Board's Compensation Committee and served on the Board's Nominating the Corporate Governance Committee.  Haley is a citizen of California.

26.    Defendant James C. Pressman ("Pressman") has served as a Zuora director since 2008.  During the Relevant Period, Defendant Pressman served on

the Board's Compensation Committee and the Board's Audit Committee. Pressman is a citizen of California.

27.     Defendant Michelangelo Volpi ("Volpi") served as a Zuora director from 2011 to June 2020.  During the Relevant Period, Defendant Volpi served on the Board's Audit Committee.  Volpi is a citizen of California.

28.     Defendant Magdalena Yesil ("Yesil") has served as a Zuora director since 2017.  Yesil received $301,900.00 in total compensation from the Company in 2018, $189,358.00 in total compensation from the Company in 2019, and $202,491.00 in total compensation from the Company in 2020.  During the Relevant Period, Defendant Yesil served on and was chair of the Board's Nominating the Corporate Governance Committee. Yesil is a citizen of California.

29.     Defendant Omar Abbosh ("Abbosh") has served as a Zuora director since July 2020.  Abbosh is a citizen of England.

30.     Defendant Sarah Bond ("Bond") has served as a Zuora director since July 2020.  Bond is a citizen of Texas.

31.     Defendants identified in ¶¶ 20-28 above are referred to herein as the "Individual Defendants."

32.     Defendants identified in ¶¶ 23, 24, 26, 27 are sometimes referred to herein as the "Audit Committee Defendants."

33.     Defendants identified in ¶¶ 21, 22, 24, 26, 27 are sometimes referred to herein as the "Insider Selling Defendants."

34.     Defendants identified in ¶¶ 20, 23, 24-26, 28-30 are sometimes referred to herein as the "Wrongful Refusal Defendants."

35.     Defendants identified in ¶¶ 20, 21 are sometimes referred to herein as the "Officer Defendants" or the "Securities Class Action Defendants."

IV.     **SUBSTANTIVE ALLEGATIONS**

36.     To enhance its line of financial application products for its subscription-based business customers, Zuora acquired new product RevPro and

then sought to integrate RevPro with its pre-existing flagship application, Billing. Unfortunately, all attempts at integration failed.  And worse, and in breach of their fiduciary duties and in violation of federal securities law, the Individual Defendants caused the Company to mislead investors and the public about the vitality of the integration and the Company's financial forecasts.  Eventually, the truth came to light, causing the Company's stock to tumble, a securities fraud class action, and other damages.

### A.     Zuora's Background and the Subscription Economy

37.    Zuora is a publicly traded company headquartered in San Mateo, California.    It designs and sells "software-as-a-service" applications for companies.  Zuora provides subscription commerce, billing, and finance systems to enterprise clients on a subscription basis, which enable its business clients in various industries to launch, manage, and transform into subscription businesses.

38.    In 2006, when defendant Tzuo founded the Company, Zuora coined the term the "Subscription Economy," which is now a $102 billion industry.  Zuora predicted that product and service companies would exponentially shift to a subscription business model, in which products and services are priced based on usage, consumption, and outcomes.  In making this business shift, Zuora predicted then-current payment processing applications would become obsolete as businesses would need subscription-based payment processing applications capable of handling the complexities associated with ongoing customer relationships, *e.g.*, prorated billing, complex revenue recognition, and flexible plans.

### B.     Zuora's Failure to Integrate its Billing and RevPro Products

39.    The Zuora "Central Platform" is the hub of Zuora's subscription management solution and is purportedly composed of six core engines: pricing, subscription orders, rating, global payments, subscription metrics, and accounting.

40.     Originally launched in 2008, the Company's primary and most widespread product is Billing, which 90% of Zuora's customers use.  Billing claims to give customers the ability to bill in a multitude of ways, prorate bills, group customers into batches for different billing and payment operations, set payment terms, consolidate invoicing across multiple subscriptions, and collect revenue.

41.     In May 2017, Zuora acquired Leeyo Software, Inc. ("Leeyo"), a revenue recognition software provider.  With this acquisition, Zuora added to its portfolio Leeyo's product RevPro.  Similar to what Billing does for managing subscription model processes, RevPro automates the range of internal, multi-departmental processes required to comply with the new Accounting Standard Codification 606/International Financial Reporting Standards 15 ("ASC 606").[1]  According to Zuora's officers, the Company's acquisition of RevPro created a "one-stop shop for automating financial operations, further increasing Zuora's dominance in the subscription economy field."

42.     Shortly after it acquired RevPro from Leeyo, in October 2017, Zuora began its attempts to implement RevPro for its own internal use in a project called Zuora on Zuora ("ZoZ").  The purpose of ZoZ was to test RevPro's compatibility with Zuora's other products on its Central Platform.

43.     During the ZoZ project, the Company encountered significant integration challenges.  Zuora discovered it could not use RevPro in connection with *any* of the Company's other applications, including its most popular product, Billing.  Zuora's highest executives, including the Individual Defendants, were informed that the ZoZ project exposed an integration failure.  Indeed, ZoZ held

---

[1]  ASC 606 mandated that companies had to adopt new standards for allocating and recognizing revenue; public companies were required to adopt such standards by the start of their fiscal year beginning after December 15, 2017, and private companies were required to do so by the start of their fiscal year beginning after December 15, 2018.  As a result of the new ASC 606 standards, companies face a more "cumbersome" internal accounting and reporting process.

weekly review meetings, which Zuora's Chief Information Officer, Alvina Antar, who reported directly to defendant Sloat, attended. In one of these project meetings in early 2018, defendant Sloat told the ZoZ project team that the market needed a seamless solution and that "Zuora needed to get its act together with RevPro."

44.     In early 2018, with the ZoZ project failing miserably, Zuora formed a new internal project coined the "Keystone Project," aimed at building a workable connection for customers between RevPro and Billing. However, just like ZoZ, the Keystone Project failed. Further, the Keystone Project highlighted that the integration failure was not customer specific; rather, it was far reaching and impacted virtually all of Zuora's customers attempting to use Billing and RevPro.

45.     The Keystone Project held weekly calls that detailed the project's updates, and defendants Tzuo and Sloat participated in these calls. Once it was clear the Keystone Project failed, the Company scrapped it in March of 2019. Thereafter, at the directive of defendant Tien, and with all of the Individual Defendants' knowledge, Zuora attempted a third project, dubbed K-2 to the fix the integration issues plaguing the Company.

46.     During the course of the ZoZ and Keystone projects, the Individual Defendants knew the Billing and RevPro integration failures were severely impacting Zuora's bottom line. As a direct result of the significant issues customers encountered when trying to use RevPro and Billing collectively, major customers refused to pay Zuora. As just one example, the Company's most important Billing customer, Zoom, which initially elected to purchase RevPro, ultimately opted not to implement the application fully due to the integration failure. Worse, Zoom stopped paying Zuora.

47.     Prior Zuora employees, who worked before and during the below representations, claim that for customers using Billing and RevPro, "there was a huge friction in reconciling the two systems," there were immediate problems (in

10

October 2017) integrating the systems, customers' unhappiness operating the two systems "came up in team meetings all the time," and Zuora had trouble selling RevPro because it did not work with Zuora Central.   According to the prior employees, as a result of the strained customer relationships, customers withheld payments due to the failed Billing and RevPro connectively, and the Company lost sales and revenue.

## C.    The Individual Defendants Caused Zuora to Make False and Misleading Statements During the Relevant Period

48.    The Individual Defendants knew Zuora's internal ZoZ integration project had failed (by early 2018), knew the Keystone Project failed (by early 2019), and knew customers had experienced failed integrations (leading, in some instances, to major customers, like Zoom, refusing to make payments). Nevertheless, from April 2018 to May 2019, the Individual Defendants concealed these failures and misleadingly represented to investors–through SEC filings, press releases, and teleconferences–robust financial forecasts based on the purported (but nonexistent) Billing and RevPro combined solution.

### 1.    The Initial Public Offering

49.    With the Leeyo (and RevPro) acquisition paving the way, on April 12, 2018, Zuora filed its registration statement and prospectus (collectively, the "Registration Statement") with the SEC in connection with its IPO, which defendants Tzuo and Sloat signed.  Concealing the already-doomed ZoZ project, the Registration Statement stated that Zuora was "well positioned to capitalize" on the shift to the subscription economy based on its ability to "orchestrate the entire subscription order-to-cash process, including billing and revenue recognition" and emphasized Zuora's "Cross-Sell Flagship Products," Billing and RevPro.

50.    According to the Registration Statement:

Our revenue growth and ability to achieve and sustain profitability will depend, in part on being able to expand our direct sales force and increase the productivity of our sales force.

11

To date, most of our revenue has been attributable to the efforts of our direct sales force. In order to increase our revenue and achieve and sustain profitability, we must increase the size of our direct sales force, both in the United States and internationally, to generate additional revenue from new and existing customers.

We believe that there is significant competition for sales personnel with the skills and technical knowledge that we require. Because our solution is often sold to large enterprises and involves long sales cycle and complex customer requirements, it is more difficult to find sales personnel with the specific skills and technical knowledge needed to sell our solution and, even if we are able to hire qualified personnel, doing so may be expensive. Our ability to achieve significant revenue growth will depend, in large part, on our success in recruiting, training, and retaining sufficient numbers of direct sales personnel to support our growth. New sales personnel require significant training and can take a number of months to achieve full productivity. Our recent hires and planned hires may not become productive as quickly as we expect and if our new sales employees do not become fully productive on the timelines that we have projected or at all, our revenue will not increase at anticipated levels and our ability to achieve long-term projections may be negatively impacted. We may also be unable to hire or retain sufficient numbers of qualified individuals in the markets where we do business or plan to do business. Furthermore, hiring sales personnel in new countries requires additional set up and upfront costs that we may not recover if the sales personnel fail to achieve full productivity. In addition, as we continue to grow, a larger percentage of our sales force will be new to our company and our solution, which may adversely affect our sales if we cannot train our sales force quickly or effectively. Attrition rates may increase, and we may face integration challenges as we continue to seek to expand our sales force. If we are unable to hire and train sufficient numbers of effective sales personnel, or if the sales personnel are not successful in obtaining new customers or increasing sales to our existing customer base, our business will be adversely affected.

51.     Furthermore, concealing the failing ZoZ project, the Registration Statement addressed the acquisition of Leeyo and the demand for the RevPro application given the new accounting standards set forth in ASC 606:

The market for our revenue recognition automation software product, [RevPro], is rapidly evolving as a result of the effectiveness of ASC 606, which makes it difficult to forecast adoption rates and demand for this product and could have a material adverse effect on our business and operating results.

We began selling [RevPro] following our acquisition of Leeyo in May 2017. We have less experience marketing, determining pricing for, and selling [RevPro], and we are still determining how to best market, price, and support adoption of this offering. We have directed, and intend to continue to direct, a significant portion of our financial and

operating resources to develop and grow [RevPro]. The market for [RevPro] is rapidly evolving as a result of the effectiveness of ASC 606, the revenue recognition accounting standard that will take effect for most public companies in January 2018. While we have seen a significant number of [RevPro] deployments, particularly in the second half of fiscal 2018, associated with the effectiveness of ASC 606, it is uncertain whether [RevPro] will achieve and sustain high levels of demand and market acceptance. Accordingly, our future success depends in part upon growth in this market and the ability of our [RevPro] product to meet the demand for revenue recognition automation solutions. We have limited experience with respect to determining the optimal prices for this solution. Companies may choose to purchase our [RevPro] product to comply with ASC 606 in the short-term but may develop proprietary solutions in-house or migrate toward other solutions developed by our competitors in the future. Customers may purchase [RevPro] as a standalone product and not purchase other core Zuora products. The rapidly evolving nature of this market, as well as other factors that are beyond our control, reduces our ability to accurately evaluate our long-term outlook and forecast annual performance. A reduction or slowdown in demand for revenue recognition automation software, caused by shifts in the marketplace, regulatory requirements, accounting standards, lack of acceptance, technological challenges, and competing solutions, could have a material adverse effect on our business, future growth, operating results, and financial condition.

## 2.   **The May 31, 2018 Form 8-K and Press Release**

52.    Following the IPO, on May 31, 2018, Zuora announced via a press release its financial results for its first fiscal quarter ended April 30, 2018.  The Company attached the press release to its Form 8-K, signed by defendant Sloat, and filed with the SEC the same day.  In the press release, Zuora stated it obtained $51.7 million in revenue and a net loss of $19.4 million for the quarter.  The filing and press release did not mention the ongoing Billing and RevPro integration failures.

## 3.   **The June 5, 2018 Tweet and Website Representations**

53.    On June 5, 2018, Zuora represented on its Twitter account: "Don't underestimate the complexity of revenue recognition.  The deep dark depths are very, very complex!  Thank goodness for Zuora + RevPro integration for a seamless order-to-revenue process!"  Similarly, from April 12, 2018 to May 30, 2019 (the class period in the securities action, *infra*), Zuora's website touted "Zoura's subscription management technology…automates the entire

customer lifecycle from a single platform," that Zuora Central is a "single platform[] for your order-to-revenue process" and "easily connects the various applications in your order-to-revenue ecosystem."

### 4. The June 13, 2018 Form 10-Q

54.    In addition to Form 8-K, the Company's corresponding quarterly report, filed on Form 10-Q on June 13, 2018, signed by defendant Sloat, reiterated the above financial results without acknowledging the failed ZoZ project.  Zuora attached Rule 13a-14(a) and 15d-14(a) certifications to Form 10-Q, pursuant to the Exchange Act and the Sarbanes-Oxley Act of 2002 (the "SOX"), which defendants Tzuo and Sloat signed.

### 5. The August 30, 2018 Form 8-K, Press Release, and Conference Call

55.    On August 30, 2018, Zuora issued a press release announcing its financial results for the second fiscal quarter ended July 31, 2018.  The Company reported $57.8 million in revenue with a net loss of $19.6 million.  In connection with this press release, Zuora held a conference call with analysts, during which defendants Tzuo and Sloat spoke enthusiastically about the Billing and RevPro applications, including the technology's purported cohesive use and long-lasting demand.  First, defendant Sloat summarized the "vision for Zuora" on the call, representing:

> If you think back 5 months ago, and you're at our road show, you basically laid out our vision for Zuora. And it really boiled down to 3 things: first, that the shift to Subscription Economy is a global trend and it's happening across all industries and all geographies; second, Zuora has built the only complete subscription management solution focused 100% on helping companies of all sizes, launch, scale and transform into a subscription business; and finally, as a result, we have a portfolio at play across the entire Subscription Economy. And as a result of that, we have a unique opportunity to deliver sustainable long-term growth and build a great business. So the question is, if we were doing a road show presentation today, would you be saying the same exact thing?

56.     Further, hiding the failed ZoZ project and the Company's attempt to salvage integration with yet another rescue mission, the Keystone Project, defendant Sloat explained that RevPro offered Zuora a "longer-term opportunity," and that the complexities of subscription businesses require a program like RevPro to automate the process of revenue recognition, stating:

> I think we're seeing 2 things. One, ASC 606 and [International Financial Reporting Standard] 15 is a good driver for customers kind of last year when we talk about 605, 606 upgrade, but what we're seeing is that companies had a time line. They had to get compliant and a lot of them chose to do that through kind of some manual band aid process, what we call. So we're seeing those guys now. They've gone through their first integration. But they know it's not sustainable, and they're going to need the revenue automation solution for 606 going forward. So those customers are still out there. But on top of that, it's all about -- the reason we did the acquisition was not 606. It is about business model complexity that hits both your quote-to-cash solution as well as your revenue automation. And that's really what we're seeing right now or the Hitachi example of that Tien touched on that, that's all about just complexity and manual processes. And they wake up -- a customer wakes up, and they realize they've outsourced all revenue to some other place, and they've got tens and tens of bodies doing this all manually. And that's not sustainable. And so that's where I think that the long kind of like tailwinds are going to be for RevPro.

57.     Likewise, defendant Tzuo raved about Zuora's experience with ASC 606 implementation as an "asset," and described Zuora's "expertise" with RevPro for revenue recognition:

> Again, we feel good. I mean -- so when we look at this year, the company has grown significantly as an independent company, and they have never raised a venture amount and so have limited ability to invest, and we've been able to invest in that business. And so -- look, when we pull back and you ask yourselves which company out there really has the most 606 experience, and I would bet that it's this team. They've done, I mean, dozens or scores of 606 implementations. Ask around for all the tech companies that you guys cover. Chances are they're using RevPro for revenue recognition. And so that expertise is an asset, especially when we can apply more distribution capability against their products.

**6.     The September 12, 2018 Form 10-Q**

58.     On September 12, 2018, Zuora filed a quarterly report on Form 10-Q, signed by defendant Sloat, which reiterated the financial results of the August 30, 2018 Form 8-K and press release.  Zuora attached Rule 13a-14(a) and

15d-14(a) certifications to Form 10-Q, pursuant to the Exchange Act and the SOX, which defendants Tzuo and Sloat signed.

### 7.   The November 29, 2018 Form 8-K and Press Release

59.   On November 29, 2018, Zuora issued a press release, which was attached to the Company's Form 8-K filed with the SEC that day.  Therein, the Company announced its financial results for its third fiscal quarter, which ended on October 31, 2018.  The press release announced $61.6 million in revenue and a net loss of $17.9 million.  In connection with the press release, Zuora held an earnings call with analysts, during which defendant Tzuo explained that Billing and RevPro were based on a "simple concept they automate the financial complexities generated by subscription models."  Specifically, and refusing to disclose either the failed ZoZ project or the Company's then-feverish attempt to find a solution through the Keystone Project, defendant Tzuo stated:

> [Billing and RevPro are] both based on a simple concept they automate the financial complexities generated by subscription models. They're highly, highly differentiated and they're mission-critical for our customers.
>
> *    *    *
>
> What we're finding is that many public companies rush to get compliant, but a lot of them did so manually with spreadsheets, and they found this to be a short-term band-aid solution. These companies are realizing that the real problem was never ASC 606; the bigger, more systemic trend is that these companies were struggling to scale their revenue operations because of all these new flexible consumption recurring models their companies were launching, and they couldn't do it with a manual Excel-based approach. ASC 606 was the thing that only highlighted the problem.
>
> *    *    *
>
> You can see that the underlying demand hasn't gone away, but our value proposition is now more centered around automation and efficiencies versus simply compliance. [It's nice to see] this quarter, we also signed on other public companies like Carbonite and Pivotal; who both chose RevPro all because we got the best revenue automation platform on the market, and there's a big, big difference between being compliant and being competitive.

60.   Defendant Sloat furthered defendant Tzuo's message, stating:

16

1
2
3
4

That was the reason to bring on the RevPro product in the first place. The need for revenue automation is not just driven by ASC 606 compliant. It's a larger issue with many of these companies. As the complexity of revenue recognition limits their ability to efficiently scale and meet their business goals. That's why we continue to see good demand for our RevPro product.

5
6

61.    Defendant Tzuo also pointed to Zuora's success in "bringing customers live" on its platform to have "a big swing effect":

7
8
9
10
11
12

[S]o it's something that I wouldn't say there's anything that we put in place in the last 90 days, but it's obviously a huge focus of ours, and we hope to continue to show continuous improvements year-over-year on these numbers, and so we feel really good. I think we benefited from the fact that we have a very sticky product, and when you look at our product, and once it goes in, whether it's on Billing on the revenue recognition side, right, it's sticky. It's running company's core operations. It's the heart of the businesses. And so the 2 factors for us that influence churn are, one, how are well are we doing bringing customers live, and that's where we continue to show improvements year-over-year.

13

**8.    The December 1, 2018 TheStreet.com Article**

14
15
16
17
18
19
20
21
22
23
24

62.    On December 1, 2018, in a TheStreet.com article, defendant Tzuo stated that subscription business models were "wreaking havoc" on billing and revenue recognition, which, he submitted, presented an opportunity for Zuora. When asked about Billing and RevPro cross-selling, defendant Tzuo indicated that the percentage of clients using both solutions is still low.  However, he added that Zuora did successfully cross-sell RevPro to major clients last quarter, such as Pivotal Software and Carbonite, and represented that business challenges involved in financially managing subscription businesses will drive additional traction.  "I think the broader message is, companies are realizing [that] these new business models...are just wreaking havoc in their financial operations," he said.  "And the two key areas that [they're] wreaking havoc on is billing and revenue recognition."

25

**9.    The December 13, 2018 Form 10-Q**

26
27
28

63.    On December 13, 2018, Zuora filed a quarterly report on Form 10-Q, signed by defendant Sloat, which reiterated the financial results of the November 29, 2018 Form 8-K and press release.  Zuora attached Rule 13a-14(a) and 15d-

17

14(a) certifications to Form 10-Q, pursuant to the Exchange Act and the SOX, which defendants Tzuo and Sloat signed.

**10.    The March 21, 2019 Form 8-K and Press Release**

64.    By March 21, 2019, Zuora had long abandoned the ZoZ project and the Keystone Project had likewise failed.  The Company issued a press release, which was attached to the Company's Form 8-K filed with the SEC.  In the press release, the Company announced its financial results for the fourth quarter ending January 31, 2019.  Zuora reported revenue of $235.2 million and a net loss of $77.6 million.  It also disclosed income guidance fiscal year 2020, with expected revenue of $289 million to $293.5 million.   In connection with the reported financial results, the Company held and earnings call with analysts.  On the call, and despite ZoZ and Keystone Project failures, defendant Tzuo touted that Zuora was the "only game in town if you're looking for a complete end-to-end subscription platform including billing and revenue recognition."

65.    Furthermore, in response to an analyst's question regarding where the Company stood with respect to sales execution and sales hiring, defendant Tzuo represented:

> We feel really good. I mean we have a whole team in place now that's taken our learnings of how to make this business model work and we have two big competitive moats; one is obviously the technology and the other one we believe is just as important, is our go-to-market expertise of how to engage with companies and how to help them understand what are the elements…. We've taken that knowledge, we've got a whole team that knows how to find the right folks, bring them onboard. We're doing a good job of hiring. We're doing a good job at [enablement]. We scaled this worldwide already. It was important for us to break through the international learnings actually before we went public, and so you're seeing our international business growing really, really well, but we feel good about where it is.

**11.    The April 18, 2019 Form 10-K**

66.    On April 18, 2019, Zuora filed its Annual Report with the SEC on Form 10-K, which was signed by defendants Tzuo and Sloat.  In Form 10-K, the

Company reiterated previous statements regarding the integrated nature of Zuora's "order-to-revenue process":

> Zuora is a leading cloud-based subscription management platform. We provide software that enables companies across multiple industries and geographies to launch, manage or transform to a subscription business model. Architected specifically for dynamic, recurring subscription business models, our cloud-based software functions as an intelligent subscription management hub that automates and orchestrates the entire subscription order-to-revenue process, including billing and revenue recognition. Our solution enables businesses to easily change pricing and packaging for products and services to grow and scale, to efficiently comply with revenue recognition standards, and to build meaningful relationships with their subscribers.

67.     The 10-K also promoted Zuora's ability to deploy and configure its solution on its clients' internal systems, explaining that "[w]e can deploy and configure our portfolio of order-to-revenue products to meet a wide variety of use cases for subscription business models," including Billing and RevPro. Furthermore, the 10-K emphasized that Zuora's solution "[f]ree[d] [u]p IT and[e]ngineering [r]esources," and that with Zuora, "engineering and IT departments no longer need to build in-house custom systems or customizations for their Enterprise Resource Planning (ERP) systems to keep up with market changes, ongoing customer demands, and new order-to-cash processes."

### 12.     The May 8, 2019 Proxy Statement

68.     On May 8, 2019, Zuora filed its Proxy Statement on Form 14(a) with the SEC pursuant to Section 14(a) of the Exchange Act (the "2019 Proxy Statement").  Specifically, with respect to Zuora's Code of Conduct, the 2019 Proxy Statement stated:

> We are committed to ethical business practices and, accordingly, we have adopted a Global Code of Business Conduct and Ethics (Code of Conduct) that applies to all the members of our [Board], officers and employees. Our Code of Conduct is available on our website at https://investor.zuora.com/governance/governance-documents.   We intend to disclose future amendments to certain portions of the Code of Conduct or waivers of such provisions granted to executive officers and directors on our website, as permitted under applicable New York Stock Exchange and SEC rules.

V.  **REASONS THE INDIVIDUAL
    DEFENDANTS' STATEMENTS WERE IMPROPER**

69.  The true facts, which were known or recklessly disregarded by the Individual Defendants during the Relevant Period but concealed from the investing public, were as follows:

a.  Billing and RevPro customers could not successfully merge the data from both systems;

b.  Zuora could not offer a robust, single system for subscription businesses to manage their monetization strategies, billing terms, customer payment and collection, and revenue recognition;

c.  the Company experienced sales execution problems (including difficulties cross-selling Billing and RevPro), reduced demand, and customers refused to pay for these services; and

d.  based on the foregoing, the Individual Defendants lacked a reasonable basis for their positive statements about the Company's financial performance and outlook during the Relevant Period.

70.  As a result of the Individual Defendants' false and misleading statements and omissions, Zuora shares traded at artificially-inflated prices during the Relevant Period.  Once the true facts regarding the Company's financial prospects and future business prospects began to emerge, the Company's stock price fell dramatically, erasing hundreds of millions of dollars market capitalization.

VI.  **THE TRUTH EMERGES**

71.  On May 30, 2019, the Individual Defendants finally admitted the truth about Billing and RevPro's failed integration.  On this date, after the trading session, Zuora announced its first quarter results for the Company's fiscal year

20

2020.  These results included quarterly revenue growth of only 22% (a decline of over 18% from the prior quarter) and a drop in large customer growth.  Further, Zuora reported it lost $20.6 million, a loss of 16% year-over-year.  This forced Zuora to lower its fiscal year 2020 guidance from a range of $289 million to $293.5 million to a range of $268 million to $278 million.

72.     In a May 30, 2019 press release, Zuora also revealed that it projected subscription revenues of only $200 to $206 million, below previous guidance of $209 to $211.5 million.  To make matters worse, the Company announced that its President and Head of Sales, defendant Diouane, would transition from that role to the role of advisor to the CEO.  Zuora advised it would conduct a search for defendant Diouane's replacement in the role of President and Head of Sales.

73.     On the same day, Zuora held an earnings call with analysts, where defendant Tzuo finally admitted that issues of "sales execution" and "product integration" were to blame for the downward guidance adjustment.  With respect to sales execution, defendant Tzuo explained that:

> First, based on what I saw in Q1, we need to improve our sales execution. As you know from our recent calls, Global 2000 companies have been an important source of our recent growth, Companies like Caterpillar, Ford and Schneider Electric. And so we've been expanding our strategic sales teams and have hired a number of talented salespeople over the past year. What we see in Q1 is that the newer reps were less than half as productive than our more experienced reps. We're finding that we need to improve the support of our new reps with training and experienced oversight to help them ramp and close new businesses.

74.     Later, on the same call, in an exchange with a Jeffries LLC analyst, defendant Tzuo admitted the integration issues with RevPro and Billing:

> [Jeffries LLC analyst]: . . . So Tien, I sort of get the integration of Billing and RevPro and how that could sort of slow some things down. But . . . I mean you bought Leeyo two years ago. So like -- it's hard[,] like how could it not be integrated? How could that be slowing things down right now? And then kind of related to that, like you're talking about cross-sell. What about the other products? Like what about CPQ and Connect and Analytics? Are you seeing any traction there? Or is that something else that also needs to be integrated better?

[Tzuo]: No, no. I'll give you some color there. We did acquire Leeyo a little less than 2 years ago, but I guess we are coming on 2 years. The first year was really focused on ASC 606, and there was such a tight deadline to get the core set up, dozens -- close to 100 customers live on ASC 606. And so John, that was -- that took us all the way through when these adoption standards were, right? So I'd call out Q1, Q2 of last year. And so honestly, we didn't really have time and the resource to focus on the integration between the 2 until after the 606 [wave] was complete. So we didn't really start heavy work on the integration until early last summer, late spring, early last summer. And long story short, we went down one direction that proved to be a dead end, a false direction. We course corrected.

75.    In the months after the May 30, 2019 call, the full extent of the Individual Defendants' knowledge (and, thus, misrepresentations and concealments) of the Billing and RevPro integration issues were revealed to the public.  For example, on September 10, 2019, at the Deutsche Bank Technology Conference, Joon Huh ("Huh"), the Company's Vice President of Investor Relations, stated that "last year, we actually spent some time doing the integration. So making sure that people that have our Billing product could also buy RevPro and have a clean integration across it."  Huh noted, however, that at that time, "We had some challenges going through it we highlighted on the Q1 call."  While Huh explained the Company "spent some time doing the integration," in truth, Zuora spent approximately *1.5 years* on the integration issues, creating two comprehensive projects designed to solve the integration issues, both of which failed entirely.

## VII.   DEFENDANTS' IMPROPER INSIDER SELLING

76.    Not all of the Company's shareholders were harmed by the Individual Defendants' misconduct.   During the Relevant Period, while in possession of material, adverse, non-public information, certain of the Individual Defendants unloaded their holdings of Zuora stock at bloated prices.  Specifically, the Insider Selling Defendants took advantage of the artificially-inflated prices to sell their Zuora shares for ***more than $49,936,467.00 million*** in proceeds:

Sloat

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 9/5/2018 | 344,009 | $26.10 | $8,978,635 |
| 3/26/2019 | 364,528 | $20.04 | $7,305,141 |
| 3/28/2019 | 35,472 | $20.00 | $709,440 |
| | | **Total** | **$16,993,216** |

Diouane

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 9/5/2018 | 5,200 | $26.71 | $138,892 |
| 9/5/2018 | 29,000 | $25.75 | $746,750 |
| 12/6/2018 | 130,500 | $18.03 | $2,352,915 |
| 3/26/2019 | 993 | $20.22 | $20,078 |
| 3/26/2019 | 129,007 | $19.75 | $2,547,888 |
| 4/29/2019 | 240,000 | $22.19 | $5,325,600 |
| | | **Total** | **$11,132,123** |

Goldman

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 3/26/2019 | 35,000 | $19.92 | $697,200 |
| | | **Total** | **$697,200** |

Pressman

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 12/17/2018 | 1,050 | $17.87 | $18,764 |
| 3/26/2019 | 1,040 | $19.76 | $20,550 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

|  | | **Total** | **$39,314** |
| --- | --- | --- | --- |

Volpi

| **Date** | **Number of Shares** | **Price** | **Proceeds** |
| --- | --- | --- | --- |
| 9/5/2018 | 28,780 | $26.52 | $763,246 |
| 12/11/2018 | 137,629 | $18.66 | $2,568,157 |
| 12/12/2018 | 563,941 | $18.77 | $10,585,173 |
| 12/13/2018 | 44,800 | $18.44 | $829,112 |
| 12/14/2018 | 23,471 | $18.32 | $521,589 |
| 12/19/2018 | 95,398 | $18.22 | $1,738,152 |
| 12/20/2018 | 39,762 | $18.26 | $726,054 |
| 1/4/2019 | 161,116 | $18.43 | $2,969,368 |
| 3/26/19 | 19,187 | $19.48 | $373,763 |
|  | | **Total** | **$21,074,614** |

77.     The Insider Selling Defendants executed these insider sales under highly suspicious circumstances—specifically, just before Zuora revealed the above-referenced material misstatements and omissions on May 30, 2019.  These dubious sales appear timed to maximize profits while the Company's stock price traded at artificially inflated prices due to the misrepresentations and material omissions detailed herein.

## VIII.  DUTIES OF THE INDIVIDUAL DEFENDANTS TO ZUORA

78.     The Individual Defendants owed and owe Zuora fiduciary duties of good faith, loyalty, due care, and candor, as well as duties pursuant to the Board's committee charters and Zuora's Global Code of Business Conduct and Ethics (the "Zuora Code").

A.    **The Individual Defendants' Fiduciary Duties**

79.    By reason of their positions as officers, directors, and/or fiduciaries of Zuora, and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed and owe the Company and its shareholders the fiduciary duties of care and loyalty, including the subsidiary duties of good faith, oversight, and disclosure.  They were and are required to use their utmost ability to control and manage the Company.  The duty of care requires informed, deliberative decision-making based on all material information reasonably available.  The duty of loyalty requires acting (including deciding not to act) on a disinterested and independent basis, in good faith, with an honest belief that the action is in the best interests of the company and its shareholders.

80.    To discharge their duties, the Individual Defendants were and are required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Zuora.  Specifically, they were and are required to, among other things:

(a)    use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner;

(b)    exercise good faith, fair dealing, and diligence in the administration of the affairs of the Company;

(c)    ensure that the Company is operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws, *e.g.*, federal and state laws and government rules and regulations;

(d)    neither violate nor knowingly permit any Zuora officer, director, or employee to violate any applicable laws, rules, or regulations;

(e)     remain informed as to the status of Zuora's operations, and upon receipt or notice of information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;

(f)     maintain systematic and accurate records and reports of Zuora's business and affairs, and procedures for the reporting of the Company's business and affairs to the Board, and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)     maintain an adequate, functioning system of internal controls, such that the affairs and operations of Zuora are conducted in accordance with all applicable laws, rules, and regulations;

(h)     avoid wasting the Company's assets and maximize the value of the Company's stock;

(i)     truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company; and

(j)     act in furtherance of the best interests of Zuora and not in furtherance of their personal interests.

81.     Finally, because of their positions, the Individual Defendants directly and/or indirectly exercise control over Zuora, and, in doing so, each have knowledge of material, nonpublic information regarding the Company.

**B.**     **Additional Duties of The Committee Defendants**

82.     In addition to their fiduciary duties, the committee members of the Board are tasked with specific duties. Defendants Fenton, Goldman, and Volpi serve on Zoura's Audit Committee (the "Audit Committee Defendants"). The Audit Committee's primary functions include, without limitation, assisting the Board in fulfilling its oversight responsibilities relating to the Company's financial

26

accounting, reporting, compliance, and internal controls.   Pursuant to their committee charter, the Audit Committee Defendants owe and owed specific duties to Zuora, including, without limitation, to:

> (a)   review and discuss with management the Company's quarterly and annual financial results and related earnings press releases and earnings guidance to be distributed to the public;

> (b)   review the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its filings with and documents furnished to the SEC;

> (c)   review and discuss with management the adequacy and effectiveness of the Company's accounting and financial reports processes and systems of internal control;

> (d)   review and discuss with management the Company's internal controls report prior to filing the Company's annual report on Form 10-K;

> (e)   prepare an annual report to the Company's stockholders for inclusion in the Company's annual proxy statements as required by SEC rules; and

> (f)   periodically review the Company's insider trading policy.

83.   Defendants Haley and Pressman serve on Zoura's Compensation Committee (collectively, the "Compensation Committee Defendants").   The Committee Committee's primary functions include, without limitation, overseeing the Company's policies with respect to the compensation of the Company's board members and officers.   Pursuant to their committee charter, the Compensation Committee Defendants, owed and owe specific duties to Zuora, including, without limitation, to:

> (a)   review the Company's compensation strategy;

(b)    review and approve compensation of officers;

(c)    evaluate and recommend the compensation of the CEO; and

(d)    review officer stock ownership guidelines.

84.    Defendants Haley and Yesil serve on Zoura's Nominating and Corporate Governance Committee (collectively, the "Nominating and Corporate Governance Committee Defendants"). The Nominating and Corporate Governance Committee's primary functions include, without limitation, developing and recommending corporate governance guidelines and policies; overseeing the evaluation of the Board and each committee of the Board; and advising the Board on corporate governance matters and federal securities laws matters. Pursuant to their committee charter, the Nominating and Corporate Governance Committee Defendants, owed and owe specific duties to Zuora, including, without limitation, to:

(a)    review the adequacy of the Zuora Code;

(b)    consider the Board's leadership structure;

(c)    consider procedures for stockholder communications; and

(d)    oversee the process for evaluation of the performance of the Board.

**C.    The Individual Defendants' Duties Pursuant to The Zuora Code**

85.    The Zuora Code applies to every Board member, officer, employee, independent contractor, and consultant. It provides that the Company strives for high ethical standards, especially of honesty and integrity, stating that:

> This Code cannot address every ethical issue or circumstance that may arise, so, in complying with the letter and spirit of this Code, employees must apply common sense, together with high personal standards of ethics, honesty and accountability, in making business decisions where this Code has no specific guideline.
>
> *    *    *
>
> Zuora expects all of its directors, executives, managers and other supervisory personnel to act with honesty and integrity, use due care and diligence in performing responsibilities to Zuora to help foster a

28

sense of commitment to this Code among all of its employees, and to foster a culture of fairness, honesty and accountability within Zuora.

86.    The Zuora Code further provides that the Company not only prioritizes legal compliance, but that it considers it only the beginning of an employee's duties:

Zuora's success depends upon each employee performing his or her duties to Zuora in compliance with applicable laws and in cooperation with governmental authorities. Zuora's success depends upon each employee operating within legal guidelines and cooperating with authorities. It is essential that each employee knows and understands the legal and regulatory requirements that apply to Zuora's business and to his or her specific area of responsibility. While an employee is not expected to have complete mastery of these laws, rules and regulations, employees are expected to be able to recognize situations that require consultation with others to determine the appropriate course of action. If any directors have any question in the area of legal compliance, he or she should approach the Chair (or, in the case of the Chair, Zuora's Compliance Officer), and if any employees have any questions in the area of legal compliance, they should approach their supervisor or Zuora's Compliance Officer immediately.

Legal compliance is only a part of Zuora's ethical responsibility, however, and should be viewed as the minimum acceptable standard of conduct. Zuora strives to act with the utmost integrity, not just in its most important corporate decisions, but also in the actions taken every day by its employees and directors. Ethical conduct is a high ideal, but often just means exercising common sense and sound judgment. Acting ethically will help Zuora become a better company, a better commercial partner for other companies, and a better corporate citizen.

87.    As insider trading is illegal and unethical, the Zuora Code directs employees to review its separate Insider Trading Policy guidelines.   The code states, in part:

Every employee is prohibited from using "inside" or material nonpublic information about Zuora, or about companies with which Zuora does business, in connection with buying or selling Zuora's or such other companies' securities, including "tipping" others who might make an investment decision on the basis of this information. It is illegal, and it is a violation of this Code, Zuora's Insider Trading Policy (the "Insider Trading Policy") and other Zuora policies, to tip or to trade on inside information. Employees who have access to inside information are not permitted to use or share that inside information for stock trading purposes or for any other purpose except to conduct Zuora business.

Employees must exercise the utmost care when in possession of material nonpublic information. The Insider Trading Policy provides guidance on the types of information that might be nonpublic and material for these purposes, and guidelines on when and how an employee may purchase or sell shares of Zuora stock or other Zuora securities.

Please review the **Insider Trading Policy** for additional information.

88. The Zuora Code requires the Company meet its disclosure obligations, and that:

Zuora's disclosure controls and procedures are designed to help ensure that Zuora's reports and documents filed with or submitted to the [SEC] and other public disclosures are complete, fair, accurate, fairly present Zuora's financial condition and results of operations and are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should be familiar with and adhere to all disclosure controls and procedures and generally assist Zuora in producing financial disclosures that contain all of the information about Zuora that is required by law and would be important to enable investors to understand Zuora's business and its attendant risks, including, but not limited to:

- no employee may take or authorize any action that would cause Zuora's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with Zuora's finance department, as well as Zuora's independent auditors and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that Zuora's books and records, as well as its reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of Zuora's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

In connection with the preparation of the financial and other disclosures that Zuora makes to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:

- act honestly, ethically, and with integrity;

- comply with this Code;

- endeavor to ensure complete, fair, accurate, timely and understandable disclosure in Zuora's filings with the SEC;

- raise questions and concerns regarding Zuora's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;

- act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and

- comply with Zuora's disclosure controls and procedures and internal controls over financial reporting.

89. The Zuora Code sets special standards for "Senior Financial Personnel," a group explicitly including Tzuo and Sloat as Zuora's CEO and CFO, respectively:

Zuora's Finance Department has a special responsibility to promote integrity throughout the organization, with responsibilities to stakeholders both inside and outside of Zuora. As such, the Board requires that the [CEO] and senior personnel in Zuora's finance department adhere to the following ethical principles and accept the obligation to foster a culture throughout Zuora as a whole that ensures the accurate and timely reporting of Zuora's financial results and condition.

Because of this special role, Zuora requires that the [CEO], [CFO], Chief Accounting Officer and any other people performing similar functions ("Senior Financial Employees"):

- Act with honesty and integrity and use due care and diligence in performing his or her responsibilities to Zuora.

\* \* \*

- Provide constituents with information that is accurate, complete, objective, relevant, timely and understandable, including information for inclusion in Zuora's submissions to governmental agencies or in public statements.

- Comply with applicable laws, rules, and regulations of federal, state and local governments, and of any applicable public or private regulatory and listing authorities.

**D. Control, Access, and Authority**

90. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Zuora, were able to, and did, directly

31

and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Zuora.

91.   Because of their advisory, executive, managerial, and directorial positions with Zuora, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Zuora.

92.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Zuora, and was at all times acting within the course and scope of such agency.

**E.   <u>Reasonable and Prudent Supervision</u>**

93.   To discharge their duties, the officers and directors of Zuora were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Zuora were required to, among other things:

>   a.   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;
>
>   b.   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;
>
>   c.   properly and accurately guide investors and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the

Company's business and financial prospects and internal controls;

d.    remain informed as to how Zuora conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

e.    ensure that Zuora was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## IX.    BREACHES OF DUTIES

94.    Each Individual Defendant and Wrongful Refusal Defendant, by virtue of their position as a director and/or officer, owed to Zuora and its shareholders the fiduciary duty of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Zuora, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants and Wrongful Refusal Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Zuora, the absence of good faith on their part, and a reckless disregard for their duties to Zuora and its shareholders that the Individual Defendants and the Wrongful Refusal Defendants were aware, or should have been aware, posed a risk of serious injury to Zuora.

95.    The Individual Defendants each breached their duty of loyalty, including the subsidiary duties of good faith, oversight and disclosure, by issuing, or causing the Company to issue, false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

96.     The Wrongful Refusal Defendants violated their fiduciary duties by failing to act independently, in good faith, and within the realm of sound business judgment in considering and responding to the Demand.

97.     In addition, as a result of the Individual Defendants' misrepresentations and concealments, on June 14, 2019, plaintiff Casey Roberts, on behalf of all persons who purchased or otherwise acquired Zuora common stock on a United States open market during the class period of April 12, 2018 to May 30, 2019, filed a securities class action against defendants Tzuo and Sloat, as well as the Company, for violating Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  *Roberts v. Zuora, Inc., et al.*, Case No. 3:19-cv-03422-SI (ND Cal. June 14, 2019).

98.     On September 9, 2019, the Court appointed New Zealand Methodist Trust Association to serve as lead plaintiff, and, on November 8, 2019, the New Zealand Methodist Trust Association filed an amended consolidated complaint (the "Securities Action").  Id.  Dkt., Nos. 54, 60.  Much of the misconduct set forth in the Securities Action is set forth herein, including that defendants Tzuo and Sloat made materially false and misleading statements concerning: (i) the functionality of Billing and RevPro and the applications' ability to work together; and (ii) the decrease in sales and demand for Zuora's products due to the RevPro and Billing integration problems.

99.     Defendants Tzuo and Sloat filed a motion to dismiss the Securities Action on January 22, 2020.  However, on April 28, 2020, the United States District Court Judge Susan Illston denied the motion in full, finding the complaint sufficiently alleged "Zuora and the individual defendants made numerous false or misleading statements promoting the [RevPro's and Billing's] functionality" . . . and "'omitted to disclose a fundamental technical challenge': that customers 'could not successfully integrate the data from [Billing and RevPro],'" and that

34

"'[t]he failed [RevPro and Billing] integration problems ultimately resulted in reputational damage and reduced demand for all of Zuora's products, including RevPro, the [c]entral platform, and other homegrown Zuora products.'" Id. Dkt., No. 75.

100.   In denying the motion to dismiss, the Court rejected defendants' arguments that the statements were non-actionable, forward-looking statements and that the statements lacked materiality.  The Court determined that the operative complaint sufficiently alleges materially false and misleading statements related to the functionality of RevPro and Billing, as well as statements related to the demand and sales for Zuora's products.

101.   In particular, the Court found the complaint alleges the statements were materially false or misleading because Billing and RevPro were not integrated, meaning Zuora's clients had "to either export the data from [Billing] and import it into [RevPro] manually, or build a customized integration that could ingest the required data from [Billing] into [RevPro]."  Plaintiffs also allege with particularity that the statements are contradicted by the failures of the ZoZ and Keystone Projects as well as the problems that Zuora's customers experienced when they tried to implement both products, including significant issues with major customers refusing to pay Zuora due to integrations problems.

102.   In denying the motion to dismiss, the Court further found the complaint links the defendants' representations about the functionality and integration of its products with the statements relating to growth and growth strategy.  For example, the Registration Statement identifies as a "key element" of Zuora's growth strategy "increasing transaction volume and upsells and cross-sells with additional products," including a "focus on acquiring new customers through [its] flagship products, [Billing] and [RevPro]."

103.   As such, the Court found the complaint satisfactorily alleges the defendants did not have a reasonable basis to believe that the Billing and RevPro

35

products were integrated or would work "seamlessly" or "easily" with each other because they were aware of undisclosed facts such as the failed Zo[Z] and Keystone projects and customer integration issues.  Similarly, for the same reasons, the challenged statements about growth and cross-selling and upselling, which were predicated on the successful integration and implementation of RevPro, are actionable.

104.   The Securities Action seeks all damages and remedies under the Exchange Act, as well as the plaintiffs' costs and expenses, including reasonable attorney fees.  Through its IPO, Zuora sold 12.7 million shares of common stock to the public at a price of $14.00, netting nearly $160 million in cash proceeds.  A result of the aforementioned misrepresentations and concealments, the stock price reached a high of $28 in June 2019, whereby Zuora attained over $3 billion in market capitalization.  After the defendants' fraud came to light, on May 31, 2019, Zuora closed at $13.99, erasing $520 million in market capitalization.

105.   Given the heightened pleading standards applicable to the Securities Action, namely Fed. R. Civ. 9(b) and the Private Securities Litigation Reform Act (15 U.S.C. § 78u-4), and given the Securities Action survived defendants' motion to dismiss, there is a high degree of certainty that defendants Tzuo and Sloat will face significant liability for their misconduct.  Consequently, Zuora has expended, and will continue to expend, significant sums of money to rectify the wrongdoing detailed herein.

## X.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

106.   In committing the wrongful acts alleged herein, the Individual Defendants and Wrongful Refusal Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual

36

Defendants and Wrongful Refusal Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

107.   During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

108.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

109.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

110.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

1  ## XI.  DAMAGES TO ZUORA

2  111.  As a result of the Individual Defendants' wrongful conduct, Zuora

3  disseminated false and misleading statements and omitted material information to

4  make such statements not false and misleading when made.  The improper

5  statements have devastated Zuora's credibility.  Zuora has been, and will continue

6  to be, severely damaged and injured by the Individual Defendants' misconduct.

7  112.  Further, as a direct and proximate result of the Defendants' conduct,

8  Zuora has expended, and will continue to expend, significant sums of money.

9  Such expenditures include, but are not limited to:

10           a.    costs incurred in investigating and defending Zuora and certain

11                 officers in the Securities Class Action;

12           b.    costs incurred from compensation and benefits paid to the

13                 Individual Defendants, which compensation was based, at least

14                 in part, on the Company's artificially inflated stock price; and

15           c.    costs incurred from the loss of the Company's customers'

16                 confidence in Zuora and its products.

17  113.  Moreover, these actions have irreparably damaged the Company's

18  corporate image and goodwill.  For at least the foreseeable future, Zuora will suffer

19  from what is known as the "liar's discount," a term applied to the stocks of

20  companies who have been implicated in illegal behavior and have misled the

21  investing public, such that the Company's ability to raise equity capital or debt on

22  favorable terms in the future is now impaired.

23  ## XII.  DERIVATIVE AND DEMAND ALLEGATIONS

24  114.  Plaintiff brings this action derivatively, in the right and for the benefit

25  of Zuora, to redress injuries suffered, and to be suffered, by Zuora as a direct result

26  of the Individual Defendants' and the Wrongful Refusal Defendants' breaches of

27  fiduciary duties and other violations of law.  Zuora is named as a nominal

28  defendant solely in a derivative capacity.

115.   Plaintiff will adequately and fairly represent the interests of Zuora in enforcing and prosecuting its rights.

116.   Plaintiff is, and has continuously been, a shareholder of Zuora since prior to the start of the Relevant Period, and has been a shareholder at all relevant times, including at the time of the Individual Defendants' and Wrongful Refusal Defendants' wrongdoing complained of herein.

117.   As detailed below, Plaintiff's pre-suit Demand has been wrongfully ignored by the Board, forcing Plaintiff to file this shareholder derivative action on behalf of the Company.

118.   Given the Board's wrongful, bad-faith, and unreasonable failure to respond to Plaintiff's lawful Demand to sufficiently investigate the misconduct, and/or to take sufficient action to remedy the harms caused to the Company, this shareholder derivative action should be permitted to proceed.

### A.   Plaintiff's Demand Allegations

119.   Before filing this derivative action, Plaintiff first demanded that the Board take action to investigate and redress the misconduct alleged herein. Specifically, on June 10, 2020, in accordance with Delaware law, Plaintiff issued the Demand on the Board to investigate, and if warranted, commence legal action against certain of the Company's current and former directors and executive officers who violated and caused the Company to violate the federal securities and applicable laws, *inter alia*, and who accordingly caused the damages the Company has suffered in connection with the events underlying the Securities Class Action. A true and correct copy of the Demand is attached hereto as **Exhibit A**.

120.   The Demand relayed that Zuora should not have to bear the colossal financial burden caused by the Individual Defendants' breaches of fiduciary duties and violations of federal laws.   Plaintiff demanded the Board pursue the Company's claims against the Individual Defendants.   Specifically, Plaintiff demanded the Board:

- undertake an independent investigation of defendants Tzuo, Sloat, and Diouane (and any others who may be similarly liable) for their violations of federal law in the Securities Action and any related or similar litigation; and

- cause Zuora to file a complaint for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, contribution, and indemnification.

121.   Plaintiff further demanded that the Board effect a series of affirmative actions to redress the wrongs described herein and prevent such wrongdoing from occurring again in the future.  Such measures included, without limitation:

- requiring defendants Tzuo, Sloat, and Diouane to account to Zuora for all damages sustained, or to be sustained, by the Company due to the above misconduct;

- making certain that no Company funds are used towards any settlement or resolution of the Securities Action or any related litigation;

- terminating any Company employees or consultants responsible for the above misconduct, including defendants Tzuo and Diouane;

- requiring defendants Tzuo, Sloat, and Diouane to return to the Company all salaries and other remuneration paid to them while in breach of their fiduciary duties; and

- adopting internal controls and systems at the Company to ensure the above misconduct does not occur in the future.

122.   Notwithstanding that more than eight months have passed since Plaintiff issued the Demand—and in total and patent contravention of Delaware law and the directors' fiduciary duties—the Board unreasonably and wrongfully ignored the Demand.

123.   The Board failed to act independently, in good faith, and within the realm of sound business judgment when it elected to ignore the Demand.

124.   The Board's failure to conduct a bona-fide and independent investigation or even address the accuracy of the Company's public disclosures (and engage in a meaningful and transparent process) was improper and directly at odds with the Board's fiduciary duties.

125.   The Board's abdication of its duty to investigate the centerpiece of the Demand (the accuracy of the Company's public disclosures, which ultimately precipitated the Securities Class Action) was not reasonable, was a decision made in bad faith, and is not entitled to the protections of the business judgment rule and likewise warrants that this action proceed.

126.   Zuora has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Wrongful Refusal Defendants have not filed any lawsuits against any persons who were responsible for the wrongful conduct.  Thus, the Wrongful Refusal Defendants continue to breach their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches.

127.   If Zuora's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the shareholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case may contain provisions that eliminate coverage for any action brought directly by Zuora against the Individual Defendants, known as the "insured versus insured exclusion."

128.   As a result, if the Wrongful Refusal Defendants were to sue any of themselves or certain of the officers of Zuora, there would be no D&O Insurance

protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Wrongful Refusal Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

129.   Plaintiff has not made any demand on shareholders of Zuora to institute this action since such demand would be a futile and useless act for the following reasons:

   a. Zuora is a publicly traded company with thousands of shareholders of record and at least hundreds of thousands of beneficial owners;

   b. Making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Zuora's shareholders; and

   c. Making demand on all shareholders would force Plaintiff to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

## COUNT I

### Breach of Fiduciary Duties
### (Against the Officer Defendants)

130.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131.   The Officer Defendants owed fiduciary duties to Zuora and its shareholders.  By reason of their positions as fiduciaries to the Company, the Officer Defendants owed duties of good faith, loyalty, candor, and truthful

disclosure.  The Officer Defendants also owed Zuora fiduciary duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law, which impose broad obligations on Defendants vis-a-vis the corporation and its individual shareholders.  In addition, the Officer Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Ethics, and principles that, had they been discharged in accordance with the Officer Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

132.   The Officer Defendants violated these fiduciary duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.  The Officer Defendants were well aware of the relevant disclosure laws, rules, and regulations.

133.   The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways: affirmatively and repeatedly making and/or failing to correct improper statements in press releases, SEC filings, conference calls, and other public statements, relating to, among other things, Zuora's business, operations, and growth prospects; failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws; and/or failing to implement and maintain adequate internal controls.

134.   As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, Zuora has sustained significant damages.  Accordingly, the Officer Defendants are liable to the Company.

135.   Plaintiff, on behalf of Zuora, has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**COUNT II**

**Breach of Fiduciary Duties**
**(Against the Individual Defendants)**

136.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.   The Individual Defendants owed and owe Zuora fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Zuora the highest obligation of loyalty, due care, good faith, fair dealing, and candor in the administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance with state and federal securities laws, rules, and regulations, as well as the duty of candor and truthful disclosure with respect to their public statements.

138.   The Individual Defendants also owed and owe Zuora fiduciary duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law, which impose broad obligations on Defendants vis-a-vis the corporation and its individual shareholders.  The Individual Defendants violated these fiduciary duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.

139.   In addition, the Individual Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Ethics and the charters of various Board committees, and principles that, had they been discharged in accordance with the Individual Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

140.   Each Individual Defendant violated his or her fiduciary duties by consciously causing, or consciously failing to prevent the Company from engaging in, the improper acts complained of herein.

141.   The Individual Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(i)     Failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf;

(ii)    Affirmatively and repeatedly making or allowing to be made, and/or failing to correct, improper statements in Company press releases, SEC filings, and other public statements relating to, among other things, Zuora' business, operations, and prospects;

(iii)   Failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws;

(iv)    Awarding Zuora' senior executives lavish compensation packages despite their responsibility for the Company's willful misconduct; and

(v)     Reappointing certain directors who had failed in their duties to the Audit Committee.

142.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zuora has sustained significant damages. Accordingly, the Individual Defendants are liable to the Company.

143.   Plaintiff, on behalf of Zuora, has no adequate remedy at law.

## COUNT III

### Breach of Fiduciary Duties
### (Against the Wrongful Refusal Defendants)

144.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145. The Wrongful Refusal Defendants owed and owe Zuora fiduciary obligations. By reason of their fiduciary relationships, the Wrongful Refusal Defendants specifically owed and owe Zuora the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company.

146. The Wrongful Refusal Defendants violated these fiduciary duties by failing to act independently, in good faith, and within the realm of sound business judgment in considering and responding to the Demand.

147. As a direct and proximate result of the Wrongful Refusal Defendants' breaches of their fiduciary obligations, Zuora has sustained significant damages. Accordingly, the Wrongful Refusal Defendants are liable to the Company.

148. Plaintiff, on behalf of Zuora, has no adequate remedy at law.

**COUNT IV**

**Waste of Corporate Assets**
**(Against All Defendants)**

149. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

150. As a result of Defendants' misstatements and failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, Zuora is subject to the Securities Class Action. Defendants have caused Zuora to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

151. As a result of their waste of corporate assets, Defendants are liable to the Company.

152. Plaintiff, on behalf of Zuora, has no adequate remedy at law.

**COUNT V**

**Unjust Enrichment**
**(Against All Defendants)**

153.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.   By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Zuora.  Defendants were unjustly enriched as a result of the compensation and remuneration they received while breaching fiduciary duties owed to the Company.

155.   Plaintiff, as shareholders and representatives of Zuora, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

156.   Plaintiff, on behalf of Zuora, has no adequate remedy at law.

**COUNT VI**

**Derivatively for Contribution Under Sections 10(B)**
**and 21D of the Exchange Act**
**(Against the Securities Class Action Defendants)**

157.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.   During the Relevant Period, Zuora and the Securities Class Action Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Relevant Period, did: (i) deceive the investing public, including Plaintiff and other shareholders, as alleged herein; and (ii) caused Plaintiff and other shareholders to purchase Zuora common stock at artificially inflated prices.

159.   The Securities Class Action Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

47

misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Zuora common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

160.   Zuora and the Securities Class Action Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

161.   During the Relevant Period, the Securities Class Action Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

162.   Zuora and the Securities Class Action Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Zuora and the Securities Class Action Defendants engaged in this misconduct to conceal Zuora' true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

163.   Plaintiff and the shareholders have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Zuora' common stock.  Plaintiff and other shareholders would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Zuora' common stock had been artificially inflated by Defendants' fraudulent course of conduct.

164.   As a direct and proximate result of Zuora' and the Securities Class Action Defendants' wrongful conduct, Plaintiff and the other shareholders suffered damages in connection with their respective purchases of the Company's common stock during the Relevant Period.

165.   By virtue of the foregoing, Zuora and the Securities Class Action Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT VII

**Breach of Fiduciary Duty**
**Through the Misappropriation of Material,**
**Non-Public Information**

**(Against the Insider Selling Defendants)**

166.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167.   At the time the Insider Selling Defendants sold their Zuora stock, they knew the information described above and sold Zuora stock on the basis of such information.

168.   The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold Zuora stock.

169.   The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

170.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

49

171.   Plaintiff, on behalf of Zuora, has no adequate remedy at law.

**XIII.   <u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Finding that all of the Defendants have breached their fiduciary duties to the Company, wasted corporate assets, were unjustly enriched, and violated the federal securities laws;

B.      Directing Zuora to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote on the following corporate governance proposals, actions, or policies:

- a proposal to strengthen the Company's accounting and disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and the public;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of Zuora to nominate three candidates for election to the Board;

- an accounting by the Zuora officers to the Company for all damages sustained, or to be sustained, by the Company by reason of the wrongs and misconduct complained of herein, and should make certain that no Company funds are used towards any settlement or resolution of the Securities Class Action, or any related or similar litigation;

- the termination, for cause, any Company employee responsible for the wrongdoing alleged herein, including Tien Tzuo and Tyler Sloat;

- the return to the Company all salaries, bonuses, and the value of other remuneration of whatever kind paid to them during the time they were in breach of their fiduciary duties; and

- the payment of interest by Zuora officers, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct.

C.   Against each Defendant in favor of Zuora for the amount of damages sustained by Zuora, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

D.   Requiring Defendants to return to Zuora all compensation and remuneration of whatever kind paid to them by the Company during the time that they were in breach of their fiduciary duties;

E.   Directing Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Zuora's directors, officers, and employees do not engage in wrongful or illegal practices;

F.   Granting additional appropriate equitable and/or injunctive relief to remedy Defendants' misconduct, as permitted by law;

G.   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

H.   Granting such other and further relief as this Court deems just and equitable.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## XIV.  <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial as to all issues so triable.


Dated:  February 17, 2021                    **JOHNSON FISTEL, LLP**

By: /s/ Brett M. Middleton
BRETT M. MIDDLETON

FRANK J. JOHNSON
KRISTEN O'CONNOR
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
BrettM@johnsonfistel.com
FrankJ@johnsonfistel.com
KristenO@johnsonfistel.com

*Attorneys    for    Plaintiff    Timothy
Compernolle*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**<u>VERIFICATION</u>**

I, Timothy Compernolle, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: February __15__, 2021

DocuSigned by:

*Timothy Compernolle*

C56B11D98D124AB...

(Signature of Timothy Compernolle)